IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

Plaintiff,

v.

CHARTWORLD SHIPPING
CORPORATION, NEDERLAND
SHIPPING CORPORATION, and
VASILEIOS MAZARAKIS,

Defendants.

Criminal Action No. 1:19-cr-00058-RGA

**MEMORANDUM ORDER**

Presently before me are Defendants' Motion to Suppress Evidence and Motion to Suppress Statements by Vasileios Mazarakis (D.I. 46) and the outstanding willfulness issue in Defendants' Motion to Dismiss Counts One, Two, Three, and Five of Indictment, and Alternatively to Compel Election between Counts (D.I. 51). I have already resolved Defendants' Motion to dismiss in all other respects. (D.I. 111). The Parties have briefed the issues. (D.I. 47, 52, 75, 76, 85, 88, 105, 106, 107). I heard argument and testimony on August 16, 2019.

For the reasons discussed below, I will deny Defendants' motion to suppress and deny Defendants' motion to dismiss based on the government's failure to allege willfulness in the indictment.

**I. BACKGROUND**

Defendants are charged in a six-count indictment with crimes related to environmental violations committed on board the M/V Nederland Reefer. (*See* D.I. 14). The M/V Nederland Reefer is a Bahamian flagged refrigerated cargo/container ship.

Large oceangoing vessels like the M/V Nederland Reefer produce a considerable volume of oily waste. The primary types of oily waste are sludge and bilge waste. Sludge is generated when petroleum products are purified for use in the ship's engines. Acceptable methods for disposing of sludge are incineration on board the vessel or offloading at port.

Bilge waste is a mixture of oil and water that accumulates in the bottom of the ship, a.k.a. the bilge. Oil accumulates in the bilge as it leaks from machinery on the ship. Bilge waste is collected, stored, and processed on the ship to remove oil from the water before it is dumped overboard. The separation process is completed by a device known as the Oily Water Separator in conjunction with an Oil Content Monitor. Pursuant to environmental regulations, water can be sent overboard only if it is at or below 15 parts per million oil. All discharges and internal transfers of bilge waste are recorded in the ship's Oil Record Book.

On February 15, 2019, the United States Coast Guard issued a Captain of the Port Order to the M/V Nederland Reefer that it would undergo a Port State Control inspection when it arrived at Port in Delaware. The ship arrived on February 20, 2019 and was boarded by the Coast Guard inspectors on the morning of February 21, 2019.

The inspection included testing of the Oily Water Separator. At that time, Defendant Vasileios Mazarakis served as the M/V Nederland Reefer's Chief Engineer. He reported to the ship's Master and supervised the engine room crew. He was the individual responsible for the Oily Water Separator and making entries into the Oil Record Book. Chief Mazarakis conducted operational testing of the Oily Water Separator under the supervision of Coast Guard Chief Warrant Officer David Turman. When water was pulled from the bilge holding tank, Chief Mazarakis was not able to run the Oily Water Separator without setting off the alarm on the Oil Content Meter. The alarm meant that the water had more than 15 ppm of oil. When Chief

Mazarakis readjusted the settings, the Oily Water Separator would run with the Oil Content Monitor reading "zero." Following this testing, CWO Turman concluded that further inspection of the Oily Water Separator was necessary. That inspection led to a decision to expand the Port State Inspection to include MARPOL compliance. In the end, the Coast Guard completed a search of the entire ship over the course of about a week.

As a result of the inspection, the Coast Guard cited the M/V Nederland Reefer with more than a dozen deficiencies related to the Oily Water Separator, the Bilge Holding Tank, the vessel's incinerator, and the Oil Record Book. The Coast Guard detained the vessel until the vessel owner provided security authorized by 33 U.S.C. § 1908(e). The Agreement on Security reached between the government and entity Defendants required that the company post a $1,000,000 bond and included certain other non-monetary conditions, including providing for the crew.

Chief Mazarakis, whose first language is Greek, was interviewed in English by Coast Guard Authorities on February 21 and 22. Those interviews were recorded and transcribed. The February 21 interview took place in a state room and was conducted by Chief Warrant Officer Aaron Studie and Lieutenant Thomas McGuire. Neither CWO Studie nor Lt. McGuire was carrying a weapon. The February 21 interview lasted 41 minutes.

The February 22 interview took place in the ship's office. The office measures approximately 10 feet by 15 feet. Four individuals from the Coast Guard were present: CWO Studie, Lt. McGuire, Special Agent Brent McKnight, and Special Agent Barry Buck. Agent McKnight and Agent Buck, although dressed in plain clothes, were carrying .40 caliber pistols. Questioning was conducted primarily by CWO Studie and Lt. McGuire. The door to the office was closed and only individuals affiliated with the Coast Guard were allowed in the room during

the interview. Special Agent McKnight advised Chief Mazarakis at the start of the interview that the door was closed for privacy and that he was not detained. In the middle of the interview, Agent McKnight asked Chief Mazarakis if he had asked for a lawyer. Several minutes later, the interview was concluded after Chief Mazarakis said he wanted a lawyer. Testimony during the August 16, 2019 hearing was that Chief Mazarakis complained during the interview that he was having serious abdominal pain. The February 22 interview lasted 42 minutes. Chief Mazarakis' shore pass was revoked on February 22. It is not clear from the record whether the pass was revoked before or after the February 22 interview.

## II. DISCUSSION

### A. Motion to Suppress

There are three primary issues raised in Defendants' Motion to Suppress: (1) whether the warrantless search of the M/V Nederland Reefer violated Defendants' Fourth Amendment Rights, (2) whether the Coast Guard's questioning of Chief Mazarakis resulted in involuntary statements or violated *Miranda*, and (3) whether the Agreement on Security is unconstitutional.

#### 1. Search of the M/V Nederland Reefer

The Coast Guard's search of the M/V Nederland Reefer did not violate Defendants' Fourth Amendment rights. The Coast Guard possesses broad, general authority to board foreign vessels in United States waters to conduct warrantless safety and document inspections as well as searches, seizures, and arrests. This authority is provided by 14 U.S.C. § 522(a):

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of

4

> the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

If a Coast Guard official develops a reasonable suspicion of criminal activity during a safety and document inspection, she may search the vessel without a warrant. *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 217 (3d Cir. 1998).

The Coast Guard also has certain specific authority to inspect a ship to determine its compliance with the International Convention for the Prevention of Pollution from Ships ("MARPOL") and the Act to Prevent Pollution from Ships ("APPS"). It has the authority, for example, to examine the Oil Record Book or International Oil Pollution Prevention Certificate (IOPP Certificate). *United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006) (citing 33 U.S.C. § 1904(c); 33 C.F.R. § 151.23(a)(3), (c)). The Coast Guard can expand its examination of the ship if "clear grounds exist which reasonably indicate that the condition of the ship or its equipment does not substantially agree with the particulars of its certificate." 33 U.S.C. § 1904(d). It can also inspect to "verify whether or not the ship has discharged a harmful substance in violation of the MARPOL Protocol, Annex IV to the Antarctic Protocol, or [APPS]." 33 U.S.C. § 1907(c)(2)(A). The specific contours of such inspections are outlined in 33 C.F.R. § 151.23. That regulation allows inspection of the ship's Oil Record Book, oil content meter records, and an examination of the ship. *Id.*

The Coast Guard did not violate the Fourth Amendment when it searched the M/V Nederland Reefer. Binding Third Circuit precedent holds that the Coast Guard can conduct a warrantless search of a vessel given a reasonable suspicion of criminal activity. *Varlack Ventures, Inc.*, 149 F.3d at 217. The Coast Guard boarded the M/V Nederland Reefer for the purpose of conducting a Port State Control Examination. Such an examination includes inspecting documents and doing safety testing.

The February 21, 2019 inspection and search of the M/V Nederland Reefer complied with the statutory requirements. The Coast Guard first inspected the documents, then examined the equipment to verify substantial compliance with the documents and codes. The Oily Water Separator, upon examination, raised some questions for the Coast Guard. Thus, they expanded their examination to an extended MARPOL investigation as to the Oily Water Separator. During the examination, the Coast Guard authorities developed a reasonable suspicion of criminal activity related to the Oily Water Separator. Specifically, they noticed inconsistencies with the Oil Record Book and irregularities related to the setup of the equipment. Once the Coast Guard developed a reasonable suspicion of criminal activity, pursuant to *Varlack Ventures*, they were free to complete a search of the vessel without a warrant. Thus, the Coast Guard's search did not violate the Fourth Amendment. I will not suppress the evidence obtained as a result of the search of the M/V Nederland Reefer.

### 2. Questioning of Chief Mazarakis

*Miranda* warnings are required where a suspect is both: 1) taken into custody, and 2) subjected to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "The burden is on the defendant to establish that he was subject to custodial interrogation." *United State v.*

*Mejia*, 2016 WL 7191630, at *20 (D.V.I. Dec. 10, 2016) (collecting cases). Determining whether an individual is "in custody" for *Miranda* purposes involves two inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

"Routine questioning by the Coast Guard or Customs officials is not the sort of custodial situation that normally triggers the *Miranda* requirement." *United States v. Troise*, 796 F.2d 310, 314 (9th Cir. 1986); *see also United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992); *United States v. Rioseco*, 845 F.2d 299, 303 (11th Cir. 1988); *United States v. Kiam*, 343 F. Supp. 2d 398, 405 n.10 (E.D. Pa. 2004). However, "once [Coast Guard] agents have probable cause to believe that the person they are questioning committed an offense, and that person reasonably believes that he is not free to leave, *Miranda* warnings should be administered." *Troise*, 796 F.2d at 314.

The Coast Guard's February 21st interview of Chief Mazarakis was not a custodial interrogation. That interview was conducted by two unarmed members of the Coast Guard as part of a routine inspection. Lt. McGuire testified that, during the February 21st interview, he did not have probable cause to believe that Chief Mazarakis committed a crime. He was merely exploring the issues that had been identified with the Oily Water Separator. His testimony during the suppression hearing is confirmed by the generally nonhostile tone and demeanor of the recorded interview. Given the circumstances surrounding the February 21st interview, I find that a reasonable person in Chief Mazarakis' position would have felt free to leave. Thus, I find that Chief Mazarakis was not in custody for *Miranda* purposes. I will not suppress his February 21st statements based on a violation of *Miranda*.

The Coast Guard's February 22nd interview of Chief Mazarakis was not a custodial interrogation. There are, however, several factors that pull the February 22nd interview closer to a custodial situation: the interview was conducted by four individuals, two of the interviewing individuals were armed, the tone of the questioning was more aggressive and antagonistic toward Chief Mazarakis, and Chief Mazarakis' shore pass may have been revoked at that time. Before any questioning began, however, Special Agent McKnight advised Chief Mazarakis that he was not detained and was free to leave at any time. Given that advice, a reasonable person in Chief Mazarakis' position would have felt free to leave. Special Agent McKnight also inquired during the interview about whether Chief Mazarakis had requested an attorney. It is clear that Chief Mazarakis understood he could end the interview because, when asked about whether he had a lawyer, he said, " No. At the moment no. But is serious, I ask." This indicates to me that he understood that he could end the interview and seek the advice of a lawyer if he so desired. And, in fact, Chief Mazarakis did end the interview by requesting an attorney. Thus, Chief Mazarakis has failed to carry his burden to show that he was in custody. I will not suppress his February 22nd statements based on a violation of *Miranda*.

The facts of the interviews I describe above also established the Chief Mazarakis' statements were not involuntary.

> [A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion. In determining whether a statement is voluntary, Supreme Court precedent requires consideration of the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. These surrounding circumstances include not only the crucial element of police coercion but may also include the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health.

*Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) (cleaned up). Chief Mazarakis was interviewed for less than an hour on two occasions. The relative brevity of these interviews

strongly weighs against finding that Chief Mazarakis' will was overborne. As to the February 21st interview, the recorded interview shows no sign of police coercion. During the February 22nd questioning, Chief Mazarakis was advised that he was free to leave and exercised that right to terminate the interview. Those facts establish that Chief Mazarakis maintained his free will. Thus, I find that the February 21st and 22nd interviews do not contain involuntary statements by Chief Mazarakis. I will not exclude them on an involuntariness theory.

### 3. Agreement on Security

Defendants argue that the Agreement on Security, which requires Defendants to continue to pay employees through their depositions or trial, violates their Fifth Amendment right against self-incrimination and due process. Their argument, however, is largely a non-starter. A corporation is not protected by the constitutional privilege against self-incrimination. *United States v. 42 Jars, More or Less, Bee Royale Capsules*, 264 F.2d 666, 670 (3d Cir. 1959); *see also United States v. Kordel*, 397 U.S. 1, 7 n.9 (1970) ("That the corporation has no privilege is of course long established . . . ."). Thus, the fact that the corporate Defendants were required to sustain their crew during proceedings does not violate the corporations' rights against self-incrimination.

Defendants also present a lengthy discussion of the general principles of fairness and justice underlying the Due Process Clause. (D.I. 47 at 23-28). Their argument does not fit within the contours of a motion to suppress as there is no clear delineation of which evidence would need to be suppressed if they were to succeed. This is because, as I understand their argument, the Government's entire case would need to be suppressed if Defendants are successful. Thus, I will address it not as a motion to suppress, but as a challenge to the indictment. "[A] criminal defendant may raise a due process challenge to an indictment against

9

her based on a claim that the government employed outrageous law enforcement investigative techniques." *United States v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir. 1998). "The challenged conduct must be shocking, outrageous, and clearly intolerable.... The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances." *Id.* at 230-31 (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992) (omission in original).

The conduct in this case is not so shocking or outrageous as to render it intolerable. Under APPS, when a ship is found to be in violation of the Act, "[c]learance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." 33 U.S.C § 1908(e). Thus, while conditions for the release of a ship are set by the Secretary of Homeland Security, the Secretary is not under an obligation to release the ship at all. I do not find it shocking or unreasonable that the Secretary, in exchange for allowing Defendants the return of their ship, would require that Defendants provide for their crew during the pendency of a criminal case related to the released ship. The alternative would, in my opinion, be less reasonable. That is, granting Defendants the return of their ship and allowing Defendants to abandon their former crew in the United States through the end of Defendants' criminal trial would be less reasonable than the surety actually required by the Secretary in this case. Thus, I will deny Defendants' motion to suppress based on the Due Process clause.

*B. Motion to Dismiss*

In supplemental post-hearing briefing, Defendant Mazarakis acknowledged that binding Third Circuit precedent holds that the government is not required to expressly state willfulness in the indictment charge. (D.I. 107 at 3 (citing *United States v. Krogstad*, 576 F.2d 22, 29 (3d Cir. 1978))). Thus, as it is undisputed that the government's failure to plead willfulness in the indictment is not a cognizable legal basis for dismissing the indictment, I will deny Defendants' Motion to dismiss based on that issue.

### III. CONCLUSION

Defendants' Motion to Suppress Evidence and Motion to Suppress Statements by Vasileios Mazarakis (D.I. 46) and Defendants' Motion to Dismiss Counts One, Two, Three, and Five of Indictment, and Alternatively to Compel Election between Counts based on the government's failure to allege willfulness (D.I. 51) are **DENIED**.

IT IS SO ORDERED this 17 day of September 2019.

United States District Judge